# CITY OF ST. LOUIS v. EAGLE PACKET COMPANY, Appellant.

### Division One, November 25, 1908.

1. **WHARFAGE FEES: Tonnage: Constitutional Ordinance.** A city has authority to construct a wharf on the Mississippi river, and to collect fees and charges from boats using said wharf in landing, and to regulate and proportion such fees or charges to the number of tons of the vessel using the wharf. Such fees are not tonnage charges, and do not violate the provision of the Federal Constitution denying to a State the power to "lay any duty on tonnage."

2. ————: **Proof of Use: Slack Chains.** If the defendant's boat chains remained attached to the wharf by ring-stones and chains connecting therewith, the fact that the chains were slack in the water does not show no use of the wharf.

3. ————: ————: **Attached to Railroad Piers.** If the wharf-boat chains were attached to the ring-stones of the wharf, the fact that, in time of extraordinary high water, the wharfboat to which was attached the steamboat, was also attached by other chains to the piers of an elevated railroad at the outward edge of the wharf, does not show that the steamboat did not use the wharf for landing purposes. The attachment to the piers was not the only attachment anchoring and keeping the wharfboat in position, and the ordinance provides for wharfage charges if the boat is made fast to the wharf by "anything thereto fastened," and in a broad sense the piers of the railroad, being fastened to the wharf, were in a way a part of the wharf.

4. ————: ————: **Complete Use.** In flood time complete use of the wharf is impossible, but complete use is not necessary to the right of the city to collect wharfage fees.

5. ————: ————: **What Constitutes Use** of a wharf, dock or pier, so as to create liability for wharfage, depends greatly upon the facts and circumstances of each particular case.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald,* Judge.

AFFIRMED.

*Guy A. Thompson* for appellant.

(1) The court erred in overruling defendant's demurrer to plaintiff's evidence. That evidence failed to establish that defendant in making the landings complained of, used the public wharf of the city of St. Louis. Indeed, that evidence affirmatively established that the city had no wharf when said landings were made, but that said wharf was entirely covered by the flood waters of the Mississippi river. Re Lucy E., 30 Fed. 867; Cannon v. New Orleans, 21 Wall. 577; Packet Co. v. Keokuk, 95 U. S. 80; Packet Co. v. St. Louis, 100 U. S. 423; Vicksburg v. Tobin, 100 U. S. 430; Transportation Co. v. Parkersburg, 107 U. S. 691; St. Louis v. Boeckler Lbr. Co., 13 Mo. App. 56; Cape Girardeau v. Campbell, 26 Mo. App. 12; Inman Steamship Co. v. Tinker, 94 U. S. 238. (2) The court erred in giving plaintiff's instruction 2. Authorities under point I. (3) The court erred in giving plaintiff's instruction 3. Authorities under point I. (4) The court erred in refusing to give defendant's peremptory instruction at the close of the entire case. Authorities cited under point I.

*Charles W. Bates* and *A. H. Roudebush* for respondent.

(1) The ordinance on which this action is based is valid, and has been so adjudged. Packet Co. v. St. Louis, 100 U. S. 423; St. Louis v. Transportation Co., 84 Mo. 159. (2) On the assignment that a demurrer to the evidence should have been sustained, the appellate court, in a law case, will not weigh the evidence, but will only examine the record to see if it contains evidence tending to support the verdict. Long v. Moon, 107 Mo. 334; Kennefick-Hammond Co. v. Ins. Co., 119 Mo. App. 308; Dowling v. Wheeler, 117 Mo. App. 308. (3) On the assignment that a demurrer to the evidence should have been sus-

tained, the respondent may call to the support of the verdict every reasonable inference which may be drawn from the evidence. Wilson v. Board of Education, 63 Mo. 140; Buesching v. Gas Light Co., 73 Mo. 231; Heether v. Huntsville, 121 Mo. App. 521. (4) If a wharfinger, at its own expense, provides any reasonable facilities for mooring, landing or transferring passengers or freight, and a vessel elects to use such facilities, the liability for wharfage is at once incurred. Vicksburg v. Tobin, 100 U. S. 430; The Whitburn, 7 Fed. 925; Farnam on Waters, sec. 122; 29 Am. and Eng. Ency. Law (1 Ed.), 89; Ex parte Easton, 95 U. S. 73. (5) Instruction 2 for plaintiff was proper, under the pleadings and the evidence. Fearey v. O'Neil, 149 Mo. 475; Alberger v. White, 117 Mo. 363; Century Dictionary, "Connect;" "Attach."

LAMM, J.—St. Louis, as a wharfinger, charges wharfage to river craft using its improved wharf—the rate regulated by ordinance according to tons burden, got at by customhouse, hull measurement.

The Eagle Packet Company, at the times in hand, owned and ran a fleet of steamboats plying in the carrying trade between the port of St. Louis and other ports on the navigable waters of the Mississippi and its tributaries. One of these ships was the "Spread Eagle;" another, the "Bald Eagle."

On certain dates in June, 1903, these craft came into the harbor at St. Louis, discharged and took on freight, U. S. mail and passengers and, being charged wharfage ($194.79, in the aggregate) the Packet Company refused payment. In a suit in the circuit court of St. Louis to recover said wharfage, plaintiff had judgment and defendant appeals.

The petition, counting on the ordinances regulating wharfs and wharfage dues, avers that on dates specified said steamboats came into the harbor of St.

Louis upon the waters of the Mississippi river and made fast to a certain wharfboat, fastened to the improved public wharf of the city at or near the foot of Vine street, and thereby wharfage dues were incurred.

The answer denies the averments of the petition, except in certain particulars not important on review. It next pleads that the Bald Eagle and the Spread Eagle were duly enrolled and licensed in the coasting trade of the United States and carried freight and passengers and United States mails in plying between St. Louis and other river towns. It then pleads certain provisions of the ordinances of St. Louis relating to wharfs and wharfage, and avers that under these provisions it had the option of paying wharfage in advance and did so pay for six months, covering June, 1903, and by such payment obtained a license to land the Bald Eagle a certain number of times per week and to land the Spread Eagle a certain number of times per week; that all the landings made were within the license privilege. By other averments, it alleges that the improved public wharf of defendant city was submerged by the flood waters of the Mississippi river so that it was impossible to land at said wharf or to use it in any way at said dates. It next alleged that in order to land during said flood, defendant constructed a bridge, moored its wharfboat to the steel supporting columns of the elevated railroad at the foot of Vine, and by means of said bridge and wharfboat, making no use whatever of the wharf, said steamboats took on and discharged freight, passengers and mail. As a further defense, it alleges that the demands in suit were not based upon the use of plaintiff's wharf, but are (in effect) an attempt to lay an unconstitutional duty on tonnage. That a duty on tonnage violates article 1, section 10, clause 3, of the Constitution of the United States. Following that is an averment

that the ordinances pleaded in the petition are null and void because violative of said clause 3 of section 10, article 1, of the Federal Constitution, in that the right of plaintiff to exact wharfage dues is not limited to the use of plaintiff's improved public wharf, but is in truth and fact a duty on tonnage.

In reply, plaintiff admits defendant held licenses paid for in advance for the landing of the Bald Eagle and the Spread Eagle at its wharf in its harbor during June, 1903, but avers that by express license terms the landings were restricted to a certain specified number per week and that the wharfage dues for the landings in suit were in excess of the license number. Plaintiff denies it was impossible for defendant to land its steamboats at the improved public wharf of the city or use said wharf; denies that defendant moored its wharfboat to the columns supporting the elevated railroad. Avers to the contrary that the wharfboat was fastened to the wharf and that freight, passengers and mail were landed from said steamboats on and across said wharfboat so attached to the public wharf. Plaintiff pleads further provisions of the ordinances of the city relating to wharfs and wharfage dues, and, denying that its ordinances violate the Constitution of the United States, renews its prayer for judgment.

It will be seen that the paper issues were: (1) Are plaintiff's wharf and wharfage ordinances violative of the Constitution of the United States? (2) Did defendant's license cover the landings for which wharfage is charged? (3) Did defendant use plaintiff's property, to-wit, its improved public wharf, for landing its steamboats Bald Eagle and Spread Eagle so as to become liable for wharfage as compensation for such use?

Attending to the evidence: The charter of St. Louis provides (Art. 3, sec. 26, )that: ''The Mayor

and Assembly shall have power within the city by ordinances not inconsistent with the Constitution or any law of this State or of the charter, to construct all needful improvements in the harbor; to erect, repair and regulate public wharfs and docks," etc., and "to regulate the stationing, anchoring and mooring of vessels and wharfboats within the city; to charge and collect wharfage and tonnage dues, levee rates," etc.

Ordinances were introduced to the effect following:

(1) "Sec. 382—*Wharfage Dues.*—The following wharfage dues shall be collected from each and every boat of whatever kind or description, except such as are hereinafter exempt from paying wharfage, or which a rate of wharfage is hereinafter provided for, each and every time the same shall come within the harbor of the city and land at any public wharf or landing, or be made fast thereto *or to anything thereto fastened,* or shall bring a tow into or take a tow out of the harbor or shall receive or discharge any freight or passengers in this city, to-wit: [Here follows a schedule of wharfage rates.] Provided, that during the low stages of water either in the Mississippi river or in the rivers tributary thereto making it necessary to use barges as lighters to enable boats to carry freight equal to their tonnage capacity, wharfage shall be charged on the tonnage capacity of the boat, and not on the lighters."

(2) Section 384. By that, provision was made for paying in advance at certain reductions from regular rates, also that: "If more trips are made during any week than authorized by the license . . . wharfage at the full rate specified in section 382 shall be collected for such extra trips . . but no deduction must be allowed for less trips during any one week than those authorized by the license." It further ordains that the license period on application to the

harbor and wharfage commissioners might be pieced out to cover a period during which the named vessels were prevented from running on account of low water or ice.

(3)    Section 394, which ordains that wharfage is due and collectible as soon as the liability to pay accrues; that it is due and collectible on each boat at once on its arrival at any public landing in the harbor except in cases covered by license.

(4)    Section 404, which exempts steamboats and other water craft from wharfage when they land on portions of the wharf where no money has been expended by the city to facilitate the landing of vessels or the loading or unloading of freight or passengers.

(5)    Section 411, which provides for wharfboat privileges and ordains that a specified annual rental be paid for each front foot of wharf or landing occupied by a wharfboat. That section contains this provision: "The mooring of any wharfboat shall not affect in any manner the wharfage or State or city taxes, dues or levee rates assessed or levied on any steamboat or other water craft landing thereat, but such wharfage tax, dues or rates shall be collected from each boat landing at any wharfboat as though said wharfboat was not there."

Defendant introduced its licenses for the Spread Eagle and Bald Eagle covering the wharfage time. Said licenses refer in terms to a certain number of specified landings per week for each vessel and state that the license fee, in lieu of wharfage, relates to said landings.

There was testimony satisfactorily showing that defendant's ships landed at the harbor in St. Louis in excess of the permit in the licenses and that the amount sued for was due for such excess, provided wharfage was due at all.

The record shows that in the harbor of St. Louis

on the west bank of the Mississippi river there are six miles of improved wharf and fourteen miles of unimproved. At the *locus* the improved wharf is paved with granite, from low water mark on the east, west 265 feet to the west building line of Front street or the levee. That portion of the wharf, known as Front street, lies on a horizontal plane. That portion between Front and low water mark is on a plane inclined to the river. On the west portion of the wharf is a superstructure referred to in the record as an elevated railroad built on piers or supporting steel columns. The western row of these piers is, say, thirty feet east of the west line of the wharf, the eastern row is still eighteen feet to the east. Vine is a paved public street of St. Louis running east and west at right angles to the wharf, with its foot at the wharf. As part of the wharf, the city has placed large blocks of stone, known as ring-stones, with a face variation of from eighteen to forty square feet. Their upper surface is flush with the granite paving and the stones are imbedded from two to three feet. These stones have iron staples leaded in and in each staple are several large iron rings. To these rings wharfboats are fastened by hawsers, iron chains and lines. Some of these ring-stones are closer to low water mark than others. They are put in at irregular intervals—one line of them being along the dividing line where the two planes of the wharf meet, that is, from seventy-five to eighty-five feet east of the west wharf-line.

It seems that in the port of St. Louis vessels do not tie up directly to the ring-stones on the wharf, but connect with and fasten to what is known as "wharfboats." Defendant company owned a wharfboat moored in the river at the foot of Vine. It was three hundred feet in length and was tied to some of said ring-stones by three or more iron chains. Such chains, when three are used, are known as a head-

chain, a breast-chain and a stern-chain.  One of the chains (whether the head, breast or stern one is not disclosed) of defendant's wharfboat was fastened to a ring-stone planted in the wharf by defendant, itself, some twenty years gone and we infer this particular ring-stone was nearer low water mark than the others used by the wharfboat.

In June, 1903, the Mississippi river was at flood-tide and the city wharf (at the *locus*) was wholly submerged.  The depth of water on the wharf is not stated, nor do we know how much water the wharf-boat or flatboat (hereinafter mentioned) drew.  In this condition of things, defendant's wharfboat was pulled, or floated, broadside to inland.  At high water times, the custom was to pull or float wharfboats up the levee by use of the fastening chains.  In this instance, presumably by such use, the ring-stone placed by defendant itself was pulled up, but the wharfboat at the crest of flood-tide, as at its ebb, remained attached to the other ring-stones by its other chains.  Defendant put in some testimony tending to show that these chains lay slack in the water.  It is agreed on all sides, however, that the chains were not visible under the turpid water.  And plaintiff put in proof to the effect that in locating wharfboats during flood-tide their chains were usually shortened as the water rose; and that in this instance defendant's wharfboat lay practically over the ring-stones to which its chains remained attached.  According to defendant's evidence it lay west of them so that if the chains were taut and drew they would have dragged the wharfboat towards the river instead of making it hug the shore.  It stands admitted that with the aid of some harbor officials defendant threw out two lines or chains and lashed them to the steel columns of the elevated railroad, to hold or help hold the wharfboat in place.  To use a wharf-boat in landing, devices, known in the St. Louis harbor

as "stages," were used. Stages were heavy platforms filling a like office to gangplanks over which passengers and freight wagons went on the wharfboat and thence to the ship. The plan of landing during the rise was this: A little distance west of the wharfboat as pulled inland, a flatboat was stationed. Whether this flatboat was afloat or aground on the wharf is not clear. Connecting this flatboat with the wharfboat were stages. West of the flatboat, to the dry foot of Vine, a temporary bridge was thrown over the water. Whether this bridge had intermediate supports is not disclosed. If so, presumably they rested on the wharf. Passengers and freight embarking went from Vine over this bridge to the flatboat, thence over it to the stages, thence over them to the wharfboat, thence over the wharfboat to the Spread Eagle or Bald Eagle.

Defendant was refused a peremptory instruction.

Thereupon the court gave plaintiff an instruction on the measure of recovery and one, of its own motion, relating to the form of the verdict—neither of which concerns us.

The instruction on the merits on which the case was put to the jury on behalf of plaintiff follows:

"The court instructs the jury that under the pleadings if they believe from the evidence that defendant's steamboats Bald Eagle and Spread Eagle, or either of them, made fast to or landed passengers or freight or mails at or over defendant's wharfboat riding upon the waters of the Mississippi river at or near the foot of Vine street, in the city of St. Louis, Missouri, at any of the times mentioned in the petition and statement of account thereto attached, and that such landings or fastenings were in excess in number of two landings per week for the steamboat Bald Eagle and six landings per week for the steamboat Spread Eagle; and that at said times said wharfboat was connected or attached by chains to iron ring bolts set in

the levee, then the jury should find for the plaintiff in the sum of $8.39 for each time in excess of two times per week for each of the weeks beginning June 8th and June 15, 1903, the steamboat Bald Eagle did so make fast or land passengers or freight or mail at said wharfboat, and $8.53 for each time in excess of six times per week for each of the weeks beginning June 4th, June 11th and June 18, 1903, the steamboat Spread Eagle did so make fast or land passengers, freight or mail to, at or over said wharfboat.

"And you are further instructed that although you may believe and find that in making such landing aforesaid, the defendant attached its wharfboat, on and over which said landings were made, to the piers of the elevated railroad, and constructed stages, flatboats, or bridges for the carriage of its passengers, freight and mail over the waters into and upon the pavement of Vine street, yet the plaintiff would be entitled to recover as aforesaid if you further find from the evidence that in making all such landings the defendant made use of the city's wharf by using a certain iron ring bolt or ring bolts set in said levee, for the purpose of holding and securing in position defendant's said wharfboat for its use in making such landings."

Defendant prayed and got two instructions, viz.:

"1. The court instructs the jury that the landings of the steamboats 'Bald Eagle' and 'Spread Eagle,' for which the city of St. Louis seeks to recover wharfage, were all made from the 8th of June, 1903, to the 19th of June, 1903, both inclusive; and if you find from the evidence that during all said time the improved public wharf of the city of St. Louis was entirely covered by the water of the Mississippi river, and that in making said landings said steamboats 'Bald Eagle' and 'Spread Eagle' could not, and in fact did not, make any use of said improved public wharf

on account of said high water, then and in such case your verdict must be for the defendant.

"2.  The court instructs the jury that the landings of the steamboats 'Bald Eagle' and 'Spread Eagle,' for which the city of St. Louis seeks to recover wharfage, were all made from the 8th day of June, 1903, to the 19th of June, 1903, both inclusive, and you are further instructed that the only ground upon which the power of the city of St. Louis to exact what are known as wharfage dues can be upheld, is that said city furnishes an improved wharf for the convenience of vessels, and that the masters and owners of such vessels elect to use the improved wharf, and do in fact use it, in landing such vessels, or in receiving or discharging their cargoes or passengers; and if you find from the evidence that during all of the time when the landings complained of were made, the improved public wharf of the city of St. Louis was entirely covered by the flood waters of the Mississippi river, at the time and place where it appears from the evidence that the defendant's said steamboats made said landings; so that the said improved wharf at said time and place could not, and in fact was not in any manner used by defendant in effecting said landings complained of, then and in such case your verdict must be for the defendant.''

Defendant was refused three instructions.  Two of them put a construction on the license permits relating to landings, which, under the case stated, we deem without meritorious substance.  The other singled out a fact in the case and gave it too much prominence. We shall set forth none of them, as we are of opinion they may be passed by without discussion.  The case made was clearly outside the license permission, and that view of the case is put aside.

The material errors assigned cover the following questions:  *First,* Do the ordinances of plaintiff city

regulating wharfs and wharfage dues violate the Federal Constitution? *Second,* Is the case made one to go to the jury on the facts?

I. Of the constitutionality of the ordinances.

. The clause of the Federal Constitution invoked reads: "No State shall, without the consent of Congress, lay any duty on tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another State, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay."

Defendant contends the ordinance is bad as violative of the foregoing clause. But that contention must be ruled against it; because the ordinance in question (or one of similar character) was before the Supreme Court of the United States in Packet Co. v. St. Louis, 100 U. S. 423, and was sustained against an assault broader and deeper than that delivered here. It was there argued that the ordinance violated not only the clause set forth but that clause of the Federal Constitution providing that: "No tax or duty shall be laid on articles exported from any State. No preference shall be given any regulation of commerce or revenue to the ports of any one State over those of another; nor shall any vessels bound to or from one State be obliged to enter, clear or pay duties in another;" and the other clause conferring upon Congress the right to regulate commerce among the several States. Not only so, but that it violated the Treaty of Paris, 1783, which declares that "the navigation of the River Mississippi, from its source to the ocean, shall forever remain free and open to the subjects of Great Britain and the citizens of the United States;" and violated the Treaty of Spain concluded October 27, 1795, which declares: ". . . And his Catholic Majesty has likewise agreed that the navigation of the said river, in its whole breadth from its source to the ocean, shall be free to

St. Louis v. Packet Co.

his subjects and the citizens of the United States;" and violated the historical Ordinance of 1787, which ordains that: "The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, that may be admitted into the confederacy, without any tax, impost, or duty therefor."

As said, the court, speaking through Mr. Justice HARLAN, sustained the ordinances against an assault delivered along all the lines indicated. And this court in St. Louis v. Transportation Co., 84 Mo. 156, has construed the decision in Packet Co. v. St. Louis, *supra*, as adjudging the validity of those ordinances from a constitutional viewpoint. [P. 159.]

In Packet Co. v. Keokuk, 95 U. S. 1. c. 84, *et seq.*, the United States Supreme Court, through Mr. Justice STRONG, pointed out the distinction to be observed between imposing an invalid tax upon tonnage and the mere valid collection of wharfage dues. The learned justice there said:

"To determine whether the charge prescribed by the ordinance in question is a duty on tonnage, within the meaning of the Constitution, it is necessary to observe carefully its object and essence. If the charge is clearly a duty, a tax, or burden, which in its essence is a contribution claimed for the privilege of entering the port of Keokuk, or remaining in it, or departing from it, imposed, as it is, by authority of the State, and measured by the capacity of the vessel, it is doubtless embraced by the constitutional prohibition of such a duty. But a charge for services rendered or for conveniences provided is in no sense a tax or a duty. It is not a hindrance or impediment to free navigation. The prohibition to the State against the imposition of a duty of tonnage was designed to guard against

local hindrances to trade and carriage by vessels, not to relieve them from liability to claims for assistance rendered and facilities furnished for trade and commerce. It is a tax or a duty that is prohibited: something imposed by virtue of sovereignty, not claimed in right of proprietorship. Wharfage is of the latter character. Providing a wharf to which vessels may make fast, or at which they may conveniently load or unload, is rendering them a service. The character of the service is the same whether the wharf is built and offered for use by a State, a municipal corporation, or a private individual; and, when compensation is demanded for the use of the wharf, the demand is an assertion, not of sovereignty, but a right of property. A passing vessel may use the wharf or not, at its election, and thus may incur liability for wharfage or not, at the choice of the master or owner. No one would claim that a demand of compensation for the use of a drydock for repairing a vessel, or a demand for towage in a harbor, would be a demand of a tonnage tax, no matter whether the dock was the property of a private individual or of a State, and no matter whether proportioned or not to the size or tonnage of the vessel. There is no essential difference between such a demand and one for the use of a wharf. It has always been held that wharfage dues may be exacted; and it is believed that they have been collected in ports where the wharves have belonged to the State or a municipal corporation ever since the adoption of the Constitution. In Cannon v. New Orleans, 20 Wall. 577, this court, while holding an ordinance void that fixed dues upon steamboats which should moor or land in any part of the port of New Orleans, measured by the number of tons of the boats, because substantially a tax for the privilege of stopping in the port, and, therefore, a duty or tonnage, carefully guarded the right to exact wharf-

age. The language of the court was: 'In saying this (namely, denying the validity of the ordinance then before it), we do not understand that this principle interposes any hindrance to the recovery from any vessel landing at a wharf or pier owned by an individual, or by a municipal or other corporation, a just compensation for the use of such property. It is a doctrine too well settled, and a practice too common and too essential to the interests of commerce and navigation, to admit of a doubt, that for the use of such structures, erected by individual enterprise and recognized everywhere as private property, a reasonable compensation can be exacted. And it may be safely admitted, also, that it is within the power of the State to regulate this compensation, so as to prevent extortion, a power which is often very properly delegated to the local municipal authority. Nor do we see any reason why, when a city or other municipality is the owner of such structures, built by its own money, to assist vessels landing within its limits in the pursuit of their business, the city should not be allowed to exact and receive this reasonable compensation as well as individuals.'

"No doubt, neither a State nor a municipal corporation can be permitted to impose a tax upon tonnage under cover of laws or ordinances ostensibly passed to collect wharfage. This has sometimes been attempted, but the ordinances will always be carefully scrutinized. In Cannon v. New Orleans, the ordinance was held invalid, not because the charge was for wharfage, nor even because it was proportioned to the tonnage of the vessels, but because the charge was not for wharfage or any service rendered. It was for stopping in the harbor, though no wharf was used. Such, also, was Northwestern Packet Co. v. St. Paul, 3 Dill. 454. So, in Steamship Company v. Portwardens, 6 Wall. 31, the statute held void imposed a tax upon every

ship entering the port. This was held to be a like regulation of commerce and a duty of tonnage. It was a sovereign exaction, not a charge for compensation. Of the same character was the tax held prohibited in Peete v. Morgan, 19 id. 581.

"It is insisted, however, on behalf of the plaintiffs in error, that the charge prescribed by the ordinance must be considered as an imposition of a duty of tonnage, because it is regulated by and proportioned to the number of tons of the vessels using the wharf; and the argument is attempted to be supported by the ruling of this court in State Tonnage Tax Cases, 12 Wall. 204. But this is a misconception of those cases."

We have quoted at large from Packet Co. v. Keokuk at some expense in brevity because that case was decided by the final arbiter on the matter in judgment, and because it exhausts the subject and renders further comment unfit. Taken together and fairly construed the ordinance provisions plainly pertain to wharfage and not to a duty on tonnage. In this view they aid and do not impede commerce. Being susceptible of a construction making them valid and constitutional we are bound to put that construction upon them, and shall do so.

The point is ruled against defendant.

II. Was there a case made for the jury? If not the peremptory instruction should have been given. If so, it was well overruled.

It is a trite rule of appellate procedure that in a law case, this court on appeal, on demurrer to the evidence, will only examine the record to see if the evidence supports the verdict. So, on demurrer every reasonable inference to be deduced from the evidence may be invoked against demurrant. So, in respondent's favor, all his contradicted testimony is taken as true. The trial theory of both parties litigant, as

outlined in the pleadings and instructions, was that in order to exact wharfage the Bald Eagle and Spread Eagle must have made some appreciable use of the wharf. Such, too, is the ordinance theory. [Secs. 382 and 404, *supra.*] Indeed, the idea of use of the private property of the wharfinger lies at the root and is of the essence of a legal charge of wharfage. [See authorities, *supra;* St. Louis v. Lumber Co., 13 Mo. App. 56.] This case, then, has come to narrow itself to one single question of fact, viz.: Did defendant make use of the improved wharf of St. Louis in landing its boats on the dates alleged during the flood of 1903?

That defendant's boats remained attached to the wharf by ring-stones and connecting chains is shown. It is argued these chains were slack in the water. If that were so, we cannot allow to that fact alone the significance insisted on by defendant in argument, *viz.*: that it shows it made no use of the wharf. It is shown that the wharfboat was attached also by chains to the piers of the elevated railroad and it is argued this was the only attachment anchoring and keeping it in position. But we cannot adopt that view. The jury might well infer from the use of both attachments that they were both deemed necessary to safe anchorage in a time of extraordinary peril. Besides, the ordinance provides for wharfage if the boat is made fast to the wharf by "anything thereto fastened." In a broad sense the piers of the elevated railroad, being fastened to the wharf, became in a way part of the wharf. They were certainly fastened to it and when defendant's wharfboat was fastened to the piers it came surely within the letter and, possibly, the spirit of the ordinance. But our decision need not rest on that ground. If defendant in its emergency had cut loose from the wharf and had used no portion of it and none of its appliances or conveniences to hold its wharfboat in landing, the case would stand on another foot.

True it is that during the flood complete use of the wharf was impossible, but complete use was not necessary. Such a construction would be highly inconvenient; for it would be quite impracticable, as suggested by plaintiff's counsel, to adjust wharfage dues on a flexible sliding scale with the rise and fall of the Mississippi river.

The question is: Use or no use? "What constitutes such a use of a wharf, dock, or pier as to attach a liability for wharfage depends greatly upon the facts and circumstances of each particular case." [30 Am. and Eng. Ency. Law (2 Ed.), 497, and see authorities collated in note 6 to the text.]

Take a homely case to illustrate: If A own a stake pin and lariat and if B agree to pay a shilling for the use of the stake pin and lariat in staking out his mustang, and if B fasten his mustang to the stake pin and lariat, could he escape liability to A by showing that the tether was slack while the mustang was feeding? or by showing that the beast was hobbled?

The testimony supports the verdict, and the point is ruled against defendant.

Let the judgment be affirmed. It is so ordered. All concur.